**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Delanie Belfield Ross, | ) | CIV 14-1159-PHX-PGR (MHB) |
| | ) | |
| Petitioner, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Charles L. Ryan, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

TO THE HONORABLE PAUL G. ROSENBLATT, UNITED STATES DISTRICT JUDGE:

Petitioner Delanie Belfield Ross, who is confined in the Arizona State Prison, Lewis Complex, Buckeye, Arizona, has filed a *pro se* Petition for Writ of Habeas Corpus (hereinafter "habeas petition") pursuant to 28 U.S.C. § 2254 (Doc. 1).  Respondents filed an Answer on November 25, 2014 (Doc. 19).  On December 23, 2014, Petition filed a Traverse (Doc. 22).

Petitioner lists three grounds for habeas relief, all which he claims resulted in a violation of his right to due process under the United States Constitution:

Ground 1:  the trial court lacked "jurisdiction and authority to hold and try Petitioner, which led to a void conviction, sentence, [and] unlawful confinement" when it, on August 2, 2006, "dismissed CR 2005-006706."

Ground 2:  Petitioner was convicted without proof beyond a reasonable doubt of every fact necessary to constitute the crimes charged: the jury was allowed to decide the case on an impermissible theory of guilt - the trial court failed to properly instruct the jury on consideration of the evidence.

1

2   Ground 3: Petitioner's sentence is illegal/unlawful and imposed in an unlawful manner - Petitioner's written judgment is different from the orally pronounced sentence. Petitioner was deprived of constitutionally adequate notice of the sentencing enhancements sought by the state.

3   (Doc. 1, at 6-8.)

4       Respondents contend that grounds 1 and 2 should be dismissed for failure to state a

5   federal claim, "as these claims concern Arizona law and are not cognizable on federal habeas

6   corpus review," and, in any event should be denied on their merits, and that ground 3 should

7   be denied on the merits. (Doc. 19, at 2.)

8                                **BACKGROUND**

9   **I.    Trial Court Proceedings.**

10      In February 2005, the State charged Petitioner, his wife (Veronica), and Petitioner's

11  brother-in-law (Cooper), with several charges of fraudulent schemes and artifices, theft, and

12  conspiracy ("First Indictment"). (Doc. 19[1], Exh. A.) In July 2005, Cooper pled guilty to

13  theft, a class 3 felony. (Exh. VV, at 30.) In June 2006, the trial court ruled that count one

14  of the First Indictment was duplicitous, and ordered that the State have a week to amend the

15  indictment to charge a single benefit. (Exh. B.) Instead, on June 28, 2006, the State

16  presented the case to the grand jury and the grand jury returned a second indictment against

17  Petitioner and Veronica ("Second Indictment"). (Exh. C.) The Second Indictment removed

18  Cooper as a defendant, and addressed the issue of duplicity by breaking down Count 1 of the

19  First Indictment into four separate charges of fraudulent schemes and artifices. (Id.) The

20  Second Indictment bore the same case number, CR2005-006706, as the first. In August

21  2006, the trial court granted the State's motion to dismiss the First Indictment (denoting it

22  as the "2005 indictment") noting "there being no objection by [Petitioner]." (Exh. D.) The

23  case proceeded under the CR2005-006706 case number.

24      In October 2006, the trial court remanded the case to the grand jury for a new finding

25  of probable cause. (Exh. E.) In November 2006, the grand jury returned another indictment

26  charging Petitioner and Veronica with four counts of fraudulent schemes and artifices (counts

27

28      [1]All exhibits cited in this report and recommendation are attached to Respondents' Answer (Doc. 19).

1 through 4), theft (count 5), and conspiracy (count 6), all class 2 felonies ("Third Indictment"). (Exh. F.) Veronica was also charged with an additional count of fraudulent schemes and artifices (count 7). (Id.) The case was once again remanded to the grand jury in June 2008, with the trial court finding the Third Indictment was "fundamentally unfair." (Exh. G.) The State appealed the remand order by filing a petition for special action in the Arizona Court of Appeals. (Exh. H.) In July 2008, the Arizona Court of Appeals reversed the trial court's remand order. (Exh. I.)

Prior to trial, the indictment was amended to allege Petitioner's four prior felony convictions. (Exhs. J, K.) Also, prior to Petitioner's trial codefendant Veronica entered into a plea agreement and was sentenced. (Exh. OO, at 19.) On the first day of trial, November 3, 2008, the trial court granted the State's motion to dismiss counts 6 and 7 of the indictment. (Exh. TT.) At the conclusion of his trial, Petitioner was convicted by the jury on three counts of fraudulent schemes and artifices (counts 1, 3, and 4), and one count of theft (count 5). (Exh. AAA.) On appeal, the Arizona Court of Appeals summarized the facts underlying Petitioner's convictions as follows:

> In 2003, Appellant learned that his brother-in-law, Willard Cooper, Jr. (Cooper), had a high credit score. Appellant told Cooper that he "could get [Cooper] a million dollars' worth of property and like a hundred thousand dollars in cash" based on the credit score. Cooper subsequently moved from Mississippi to Arizona to live with Appellant and Appellant's wife, Veronica.

> Appellant formed TempleBloc, Inc. (TempleBloc) under Cooper's name in March 2004, listed Cooper as president, completed the Articles of Incorporation for TempleBloc, and designated a board of directors consisting of Cooper, Veronica, and Appellant. Veronica applied for a corporate bank account under the name UPSW Dispatching Services (UPSW) and later amended her application to say that UPSW did domestic and international consulting and was owned by TempleBloc. She also added Cooper as a co-signer on to the account.

> In 2004, M. Brooks prepared a 2002 corporate tax return for UPSW and a 2003 corporate tax return for TempleBloc based on information provided to him by Appellant, who identified himself by his nickname, Lane Quue. Brooks had no experience preparing corporate tax returns and failed to obtain annual reports, profit and loss statements, or other financial records for the companies. The tax returns listed assets in the amounts of $1,546,660 and $1,031,610 for UPSW and TempleBloc, respectively. However, TempleBloc conducted no form of legitimate business. Cooper testified that he signed the tax returns because he signed anything that Appellant asked him to sign.

In 2004, Appellant leased four Hummers from Kachina Cadillac (Kachina) for himself, Veronica, Cooper, and Appellant's friend. Appellant who identified himself as Mr. Quue, negotiated the leases with T. Heiner, one of Kachina's salesmen. Appellant informed Heiner that he ran a very profitable business, was going to put the vehicles in TempleBloc's name, and was acting at the direction of Cooper. Kachina sent Cooper's credit application and TempleBloc's tax return to its credit agency, GMAC Financial Services (GMAC).

After GMAC approved the leases, Cooper signed the paperwork. He testified that Appellant told him not to talk to anyone at Kachina, to sign the documents, to write a check for $80,000 even though the money was not in the account at the time, and to leave as quickly as possible. Kachina subsequently provided the four Hummers to TempleBloc.

In June 2004, M. Lima of Luxury Home Investments, LLC (Luxury Home) was in negotiations to buy a home valued at approximately $4.2 million in Paradise Valley, Arizona (Quartz Mountain Property). Lima met Appellant, who identified himself as Lane Quue, around this same time. Although Appellant informed Lima that he was "the right-hand man" for Cooper and that he wanted to purchase properties on Cooper's behalf, Lima never met Cooper.

Luxury Home entered into a contract to purchase the Quartz Mountain Property for $2 million and the current owners' personal property for an additional $320,000. After securing the contract, Lima and Appellant negotiated a contract in which Luxury Home would sell the Quartz Mountain Property to TempleBloc for approximately $4.2 million.

After Appellant informed Lima that he was having trouble securing conventional financing for the purchase of the Quartz Mountain Property, Lima referred Appellant to J. Janssen of A&A Funding Corporation (A&A Funding). Because A&A Funding did not have the funds necessary for the Quartz Mountain Property Loan, Janssen referred the deal to J. Kapland of Mortgages, Ltd. And asked Mortgages, Ltd. to assist in funding the acquisition of the Quartz Mountain Property. Lima and Janssen gave Mortgages, Ltd. some of the paperwork it needed to complete the loan, including TempleBloc's tax return.

Mortgages, Ltd. provided TempleBloc with a $2.2 million loan to purchase the Quartz Mountain Property. Kaplan testified that he believed Appellant was Cooper, but Cooper was not involved in the acquisition of the Quartz Mountain Property and when Cooper discovered that Appellant was trying to purchase the house, he "objected to it from the start." However, after Appellant told him that everything was alright, Cooper "went on [Ross's] word" and signed the closing documents.

Luxury Home and Appellant negotiated a reduced purchase price of approximately $3.2 million for the Quartz Mountain Property in August 2004. Because TempleBloc still needed $1 million to purchase the Quartz Mountain Property, Lima contacted a private investor, Dr. R. Greenberg, to assist in securing the necessary financing. Dr. Greenberg's company, Quantum Consulting, LLC (Quantum), provided the loan for the additional $1 million.

As a result of some confusion over whether certain items of personal property were going to remain in the Quartz Mountain Property after the sale, Luxury Home gave TempleBloc a price concession. Rather than give money to TempleBloc, Luxury Home used approximately $430,000 of the price concession funds to repay a portion of Quantum's loan. While completing the price concession agreement, Lima witnessed Appellant sign Cooper's name, which concerned Lima because this was the first time he had witnessed Appellant sign anything. Because of the price concession, TempleBloc and Cooper owed Quantum $600,000, and a promissory note for this amount was recorded and was secured by the Quartz Mountain Property. [FN2]

> FN2. The State charged Appellant with one count of fraudulent schemes and artifices for the $600,000 loan from Dr. Greenberg (Count 2); however, the jury acquitted Appellant of this count at trial.

After TempleBloc secured financing, there was a simultaneous close of escrow with Luxury Home purchasing the Quartz Mountain Property from the owners for $2 million and simultaneously selling it to TempleBloc for $3.2 million. Because the parties used a nominee agreement, the deed indicated the buyer was TempleBloc and the sellers were the original owners. After the closing, Appellant and Veronica lived in the Quartz Mountain Property, but Cooper continued to reside at their previous address.

After purchasing the Quartz Mountain Property, Appellant told Cooper that he was going to release the liens because he wanted to be able to refinance. Appellant used the Internet to learn how to release liens on real property and told Cooper that by doing that, the house becomes "yours outright."

Appellant contacted A. Flagg-Thomas and asked her if she knew anyone who could notarize documents. She introduced Appellant to her friend S. Emudianughe. Emudianughe notarized two lien releases for Appellant: one in which Appellant signed as Daniel Moore in order to release the $2.2 million Mortgages, Ltd. lien, and the other in which Appellant signed as Dr. Greenberg in order to release Quantum's $600,000 lien. Both lien releases stated that the debts had been fully paid.

After recording the lien releases, TempleBloc conveyed the Quartz Mountain Property to Horizon Consulting, Inc. (Horizon). TempleBloc registered for the trade name Horizon Consulting Grant Resource (HCGR) several weeks later.

Appellant subsequently obtained an $850,000 line of credit from a private lender, J. Hancock, after Appellant told Hancock that he owned the Quartz Mountain Property "free and clear." Hancock believed that Appellant was Cooper and that Horizon was Appellant's company, and he agreed to provide draws against the line of credit to Appellant upon Appellant's request.

Before receiving any funds from Hancock, Cooper named himself president of Horizon at Appellant's request because Appellant told him that if Cooper was Horizon's president, it would enable them to deposit checks issued to Horizon in one of Veronica's bank accounts. [FN3] Hancock provided an initial draw of $225,000 to Appellant. Appellant then requested that Hancock give Quantum $250,000 as payment of the $600,000 loan.

FN3. Although TempleBloc registered for the trade name HCGR, Cooper signed a corporate resolution that made him the president of Horizon. The corporate resolution states that Horizon is a Mississippi corporation.

Appellant later requested the remaining $375,000 of the $850,000 line of credit from Hancock. However, Appellant wanted the money quickly, and Hancock denied the request because Hancock was entitled to time to come up with the money under their agreement.

After learning that the Quartz Mountain Property liens had been fraudulently released, Mortgages, Ltd. filed an affidavit of erroneous recording with the recorder's office and initiated foreclosure proceedings in December 2004. (Ex. BB at ¶¶ 2–20.)

Petitioner was sentenced on July 17, 2009, to the presumptive 15.75 years in prison on each of the four counts, and the sentences were ordered to be served concurrently. The court found that Petitioner had prior convictions for bank fraud and fraudulent schemes and artifices, both class 2 non dangerous offenses. (Exh. M.) Petitioner received credit for 1626 days of presentence incarceration.[2] (Id.) The transcripts of the sentencing hearing reflected that the trial court imposed sentence on counts 1, 2, and twice on count 4, instead of the counts of conviction, 1, 3, 4 and 5. (Exh. CCC, at 32.) The judgment, however, indicated that the sentences were imposed on the correct counts. (Exh. M.)

## II. Direct Appeal Proceedings.

Petitioner filed a timely notice of appeal to the Arizona Court of Appeals, and on June 8, 2011, Petitioner's appointed counsel filed an opening brief pursuant to Anders v. California, 386 U.S. 738 (1967), stating that he was unable to identify any arguable issues of merit. (Exh. Q.) Petitioner then filed supplemental *pro per* brief, raising the following issues (Exh. S):

1. Petitioner's due process rights were "violated when the State resubmitted [his] case before a new grand jury . . . and obtained a new charging instrument (8-9);

[2]The trial court later vacated its order granting Petitioner 1,626 days of presentence incarceration credit because it had mistakenly double-credited Petitioner for the time served and credited to his probation case, and instead awarded Petitioner 267 days of presentence incarceration credit. (Exh. O.) The Arizona Court of Appeals later reversed the trial court order, finding that the trial court had failed to correct Petitioner's sentence within 60 days of sentencing as required by Ariz.R.Crim.P. 24.3. (Exh. BB, at ¶ 115.)

2.      The State violated the Arizona Rules of Criminal Procedure and his due process rights by "add[ing] new statutes to charges that it resubmitted to a new grand jury" (9);

3.      The charging instrument was not "legally valid" and the trial court lost jurisdiction to hold and try him (9-10);

4.      The trial court failed to rule on his motions (10-17);

5.      The State presented insufficient evidence to support his convictions (20-16, 31-35);

6.      The trial court erred by failing to instruct the jury on various Arizona statutes pertaining to "criminal liability," including "criminal liability on an individual for conduct of an enterprise" (21-22, 27-28);

7.      The State "failed to correct testimony that it knew was misleading and false" (26-27, 29-31);

8.      Count 1 of the indictment was duplicitous (28-29);

9.      "[T]he charging instrument does not allege a crime against a true victim" (31, 35);

10.     The court sentenced him "pursuant to priors alleged that were not proven and pursuant to [a] sentencing allegation never formally filed" (38-40);

11.     Petitioner received an "unlawful sentence" (40).

On July 18, 2013, the Arizona Court of Appeals issued a memorandum decision affirming Petitioner's convictions and sentences. (Exh. BB.) Petitioner then filed a petition for review in the Arizona Supreme Court, which was summarily denied on March 21, 2014. (Exh. FF.) Petitioner's first post-conviction proceeding, pursuant to Ariz.R.Crim.P. 32 is still pending in state court. (Doc. 8, at 2.) The claims raised in Petitioner habeas petition only relate to claims previously raised on direct appeal, so they are exhausted for purpose of habeas review. Petitioner was previously warned that the Court would "likely [] be unable to consider any claims in his pending Rule 32 proceeding unless Petitioner first obtains authorization from the Ninth Circuit Court of Appeals to file a second or successive habeas corpus case," and advised of his right to "voluntarily dismiss his current habeas corpus case without prejudice by following the procedures set forth in Rule 41(a) of the Federal Rules of Civil Procedure." Petitioner has not done so, and in fact, filed a notice with the Court that he does not seek a stay, and requests a ruling on his habeas petition. (Doc. 28.)

**DISCUSSION**

**I.     Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).**

     **A**.     **Claim Cognizability**

     The AEDPA provides that the Court can grant habeas relief "only on the ground that [a petitioner] is in custody in violation of the Constitution or laws or treatises of the United States."  28 U.S.C. § 2254(a); Wilson v. Corcoran, 562 U.S. 1, 5 (2010).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); see Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) ("a mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas."); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law").  And, a petitioner may not "transform a state law issue into a federal one merely by asserting a violation of due process."  Poland v. Stewart, 169 F.3d 573, 584 (9th Cir. 1999) (quoting Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996)); see Engle v. Isaac, 456 U.S. 107, 120-21 (1982) ("While they attempt to cast their first claim in constitutional terms, we believe that this claim does no more than suggest that the instructions at respondents' trials may have violated state law.").  A habeas petition "must allege the petitioner's detention violates the constitution, a federal statute or a treaty." Franzen v. Brinkman, 877 F.2d 26 (9th Cir. 1989).

     **B.     Merits Analysis**

     In reviewing a cognizable claim under the AEDPA, a federal court "shall not" grant habeas relief with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the State court decision was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d); see Williams v. Taylor, 529 U.S. 362, 412-413 (2000) (O'Connor, J., concurring and delivering the opinion of the Court as to the AEDPA standard of review).  "When applying these standards, the federal court

1   should review the 'last reasoned decision' by a state court ...." Robinson v. Ignacio, 360 F.3d

2   1044, 1055 (9th Cir. 2004).

3          A state court's decision is "contrary to" clearly established precedent if (1) "the state

4   court applies a rule that contradicts the governing law set forth in [Supreme Court] cases,"

5   or (2) "if the state court confronts a set of facts that are materially indistinguishable from a

6   decision of [the Supreme Court] and nevertheless arrives at a result different from [its]

7   precedent."   Taylor, 529 U.S. at 405-06.   "A state court's decision can involve an

8   'unreasonable application' of Federal law if it either (1) correctly identifies the governing rule

9   but then applies it to a new set of facts in a way that is objectively unreasonable, or (2)

10  extends or fails to extend a clearly established legal principle to a new context in a way that

11  is objectively unreasonable." Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002)

12  (citation omitted).   This Court must "presume the correctness of [the] state courts' factual

13  findings" and a petitioner has the burden to "rebut this presumption with 'clear and

14  convincing evidence.'" Schriro v. Landrigan, 550 U.S. 465, 473-474 (2007) (quoting 28

15  U.S.C. §2254(e)(1)).

16  **II.     Ground 1.**

17         Respondents claim that Petitioner's ground 1 of his habeas petition should be

18  dismissed as non-cognizable, as Petitioner challenges the procedures used by the State to

19  remand his case to the grand jury and secure an indictment against him. Petitioner complains

20  that he was denied due process when the State elected to obtain a Second Indictment before

21  the grand jury, when the trial court had given the State a week to cure a defect (duplicity) in

22  count 1 of the First Indictment, and when the same case number was assigned to the second

23  indictment. Petitioner claims that the trial court lost jurisdiction to hold him and try him and

24  that the Second Indictment was legally void. State grand jury procedures are outlined in the

25  Arizona Rules of Criminal Procedure: see, e.g., Ariz.R.Crim.P. 12.9 (governing challenges

26  to grand jury proceedings); Ariz.R.Crim.P. 13.5 (governing "amendment of the charges" and

27  "defects in the charging document" in criminal cases).  A trial court has the authority to

28  amend an indictment under Ariz.R.Crim.P. 13.5 to "correct mistakes of fact or remedy formal

1   or technical defects," and the State is permitted to amend an indictment to charge "new and

2   different matters of substance" with "the concurrence of the grand jury." State v. O'Haire,

3   720 P.2d 119, 121 (App. 1986).

4        Other than a glancing reference to due process, Petitioner cites no authority supporting

5   his claim that having two indictments pending at once under the same case number

6   constitutes a constitutional violation.  In addition, although he argues that the trial court

7   dismissed the case, and therefore lost jurisdiction, in reality the record is clear that the First

8   (2005) Indictment was dismissed, not the entire case.  In addition, Petitioner's claim lacks

9   merit.  Petitioner presented the precise issue to the Arizona Court of Appeals,[3] and its ruling

10   on the issue was not contrary to, or an unreasonable application of, clearly established federal

11   law as determined by the United States Supreme Court, or based on an unreasonable

12   determination of the facts in light of the evidence presented in the State court proceeding.

13   The Court thoroughly addressed each of Petitioner's arguments in turn:

14       A.  Amendment of the First Indictment

15   First, Appellant contends that the First Indictment limited any future trial to the
16   specific charge or charges stated in that indictment.  He further asserts that
    under Arizona Rule of Criminal Procedure 13.5.b, the First Indictment could
17   only be amended to correct mistakes of fact or to remedy formal or technical
    defects, unless he consented to the amendment.  Appellant argues that the State
18   violated Rule 13.5.b and his due process rights by altering the nature of the
    charges and original allegations made against him.

19   Based on the record, we find this argument to be without merit.  Appellant is
20   correct that Rule 13.5.b limits the amending of an indictment to corrections of
    "mistakes of fact or [remedies for] formal or technical defects."  However, the
21   state can modify an indictment to charge new and different matters with "the
    concurrence of the grand jury."  State v. O'Haire, 149 Ariz. 518, 520, 720 P.2d
22   119, 121 (App. 1986).  The State obtained the concurrence of the grand jury
    in this case when it resubmitted the case to a new grand jury, which returned
23   the Second Indictment against Appellant.  Accordingly, we find no violation
    of Rule 13.5.b and no violation of Appellant's due process rights.

24       B.  Modification of the Entire Indictment

25   Appellant also asserts that the State arbitrarily decided to treat the entire First
26   Indictment as a remand, rather than just amending the duplicitous count one.
    He contends that defects in indictments must be attacked by a Rule 16 motion

27   _____

28      [3]In fact, the claim in his habeas petition is mostly supported by incorporating his state
    court briefing.

and the state did not file one.  Additionally, Appellant claims that the State violated the Arizona Rules of Criminal Procedure and his due process rights by treating the entire charging instrument as a remand and resubmitting the case to a new grand jury, adding new statutes, and altering the nature of the original allegations, without the court remanding or dismissing the First Indictment.

As previously discussed, the State can make substantive modifications to an indictment, but it may not do so without the concurrence of the grand jury. *State v. Kelly*, 123 Ariz. 24, 26, 597 P.2d 177, 179 (1979).  Additionally, we find no support for Appellant's argument that the State may only attack defects in an indictment by a Rule 16 motion.  The case Appellant cites states that a Rule 16 motion to dismiss the prosecution would be a proper remedy in a situation in which the indictment is challenged as being insufficient. *See State v. Superior Court ex. rel. Pima Cnty.*, 171 Ariz. 341, 342, 590 P.2d 457, 458 (App. 1977).  Nowhere in the case does it say that "[d]efects in [an] indictment must be attacked by way of Rule 16.6 motion[s]," as Appellant claims.

Contrary to Appellant's assertion, the State may return a superseding indictment "anytime before trial," in the event it needs to make substantive changes to the indictment. *State v. Superior Court ex rel. Pima Cnty.*, 137 Ariz. 534, 536, 672 P.2d 199, 201 (App. 1983).  Because the State did not merely amend the First Indictment to charge new and different matters, but rather returned a Second Indictment, we do not find that the State violated the Arizona Rules of Criminal Procedure or Appellant's due process rights.

C.  Two Indictments Under the Same Cause Number

Appellant next contends that it was impossible for the First and Second Indictments to be valid at the same time.  He asserts that only the First Indictment was valid because there cannot be two valid indictments at the same time under the same cause number; therefore, when the First Indictment was dismissed, only a void Second Indictment remained.  Alternatively, Appellant asserts that the First and Second Indictments were a single charging instrument and both would have been dismissed when the First Indictment was dismissed by the State, which left no valid charging instrument to hold and try Appellant.  Appellant believes that his due process rights were violated because the State submitted the case before a new grand jury and returned a Second Indictment under the same cause number without the trial court granting a remand or dismissal of the First Indictment.

As stated above, "[a] superseding indictment may be returned any time before trial," and it replaces the prior indictment. *Superior Court ex rel. Pima County*, 137 Ariz. at 536, 672 P.2d at 201.  While returning a second indictment under the same cause number as the first indictment is not a common practice, we do not find that this caused the superseding Second Indictment to be void because we fail to see how this resulted in any prejudice to Appellant. *See, e.g., State v. Steward*, 9 Or. App. 35, 39, 496 P.2d 40, 42-43 (1972) (stating that "the second indictment retained the same case number as the first cannot invalidate it" because the defect does not prejudice the substantial rights of the defendant); *see also State v. Young*, 149 Ariz. 580, 585, 720 P.2d 965, 970 (App. 1986) ("Absent prejudice, errors in a grand jury proceeding do not constitute reversible error when a conviction is appealed.").

The State returned the Second Indictment even though the trial court merely requested that it amend the duplicitous count one. However, Appellant did not object to the dismissal of the First Indictment. Further, the trial court found no bad faith in the State's decision to return the Second Indictment against Appellant, and it stated that the request to dismiss the First Indictment was supported by good cause. See Arizona Rule of Criminal Procedure 16.6.a ("The court, on motion of the prosecutor showing good cause therefor, may order that a prosecution be dismissed at any time upon finding that the purpose of the dismissal is not to avoid the provisions of Rule 8.").

Based on the fact that the State may return a superseding indictment at any time and the fact that a superseding indictment is not invalidated merely because it is the same cause number as the first indictment, we find that Appellant has failed to demonstrate how his due process rights have been violated or that the State's decision to obtain the Second Indictment prejudiced him. Further, Appellant has failed to explain how the First and Second Indictments affected the Third Indictment, on which Appellant was subsequently tried. Therefore, we find that the State did not violate Appellant's due process rights and the Second Indictment was a valid charging instrument to hold Appellant until it was superseded by the Third Indictment.

(Exh. BB, at ¶¶ 28-36.)

Petitioner does not discuss the Court of Appeals' resolution of this issue in his habeas petition. He does, however, allege in his Traverse that he was prejudiced in the appellate process because he did not receive a copy of the State's response to his appeal and therefore did not have an opportunity to file a reply addressing the State's arguments. (Doc. 22, at 7-9.) Petitioner fails, however, to cite facts or law that he could have been presented to the Court of Appeals that weren't already considered or that would have made a difference in the Court's analysis and decision. Petitioner furthermore "notices this court that the Arizona prison law libraries provide no legal materials beyond court rules, criminal statutes, common legal forms, and a law dictionary," and that "[g]enerally, a pro se litigant's only access to case law is what might be in the possession of other inmates." (Id.) Petitioner's claim is belied by the plethora of citations to case and other authority in Petitioner's federal and state pleadings. (Docs. 1, at 15-57, 62-74, 76-88, 97-103; 22.)

Petitioner continues to assert that the court and court minutes used the word "remand" in referring to the Second Indictment, and that this failure of the State to follow "proper procedures" on remand constitutes a due process violation and rendered that indictment invalid. (Doc. 22, at 15-Doc. 22-1, at 8.) Petitioner cites no authority in support of his argument, and in any case, does not demonstrate prejudice by the alleged incorrect

1    nomenclature.  The fact that the word "remand" may have been used inaccurately does not

2    transform an otherwise proper grand jury procedure into an improper one, and certainly did

3    not act to "cloak" the proceedings so much as to deprive Petitioner of notice of the charges

4    against him, or somehow taint the grand jury presentation or concurrence.

5         Petitioner fails to establish that the state court decision was contrary to clearly

6    established Supreme Court precedent, or that the  state court unreasonably applied the facts

7    in reaching its decision in light of the court record.  This Court will recommend that

8    Petitioner's ground 1 of his habeas petition be denied and dismissed.

9    **III.    Ground 2.**

10        To the extent Petitioner's claim is grounded on his assertion that the jury decided his

11   guilt based upon an impermissible theory of guilt, because the State invited the jury to decide

12   his case based upon accomplice liability, and the jury was not given accomplice or accessory

13   liability instructions, his claim is non-cognizable.   "Failure to give a jury instruction which

14   might be proper as a matter of state law, by itself, does not merit federal habeas relief."

15   Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).  A petitioner would have to

16   show that the failure to give a jury instruction "so infected the entire trial that the resulting

17   conviction violate[d] due process."  Id.  (citation omitted); Willard v. People of State of Cal.,

18   812 F.2d 461, 363 (9th Cir. 1987) ("Insofar as Willard challenges the jury instructions under

19   California law, his claim is not cognizable in federal habeas proceedings.") (citations

20   omitted).   Under Arizona law, "there is no requirement that the indictment charge [a

21   defendant] as an accomplice in order to permit a jury instruction to that effect. [], an accused

22   is a principal regardless of whether he directly commits the illegal act or aids or abets in its

23   commission."  State v. McInelly, 704 P.2d 291, 292-93 (App. 1985).

24        In any event, Petitioner's claim lacks merit.  He cites no place in the record where the

25   State "invited jurors to decide the case on the theory that [Petitioner] was an accomplice."

26   (Doc. 22-1, at 11.)  This Court has reviewed the transcripts of the State's opening and closing

27   arguments, and, other than referring to Petitioner AND his co-defendants as accomplices,

28   there is no such invitation.  (Exhs. UU at 22-29; ZZ, at 69-91, 120-132.)   In fact, the State

1  in its closing arguments stressed the direct involvement of Petitioner in all five counts

2  charged, and even referred to Petitioner as the "puppet master."  (Doc. ZZ at 69-71, 131.)

3      Insofar as Petitioner claims that there was insufficient evidence of guilt, the "clearly

4  established Federal law" applicable is Jackson v. Virginia, 443 U.S. 307, 319 (1979), under

5  which "the relevant question is whether, after viewing the evidence in the light most

6  favorable to the prosecution, any rational trier of fact could have found the essential elements

7  of the crime beyond a reasonable doubt."  This analysis "ask[s] whether the decision of the

8  [state appellate court] reflected an 'unreasonable application of' Jackson . . . to the facts of

9  this case."  Juan H. v. Allen, 408 F.3d 1262, 1274-75 (9th Cir. 2005).  As to Petitioner's

10  insufficiency of the evidence claim the Court of Appeals found as follows:

11      [].    Fraudulent Schemes and Artifices

12      Fraudulent schemes and artifices is committed when a person,
"pursuant to a scheme or artifice to defraud, knowingly obtains any benefit by

13  means of false or fraudulent pretenses, representations, promises or material
omissions."  A.R.S. 13-2310.A (2010).  The term "benefit" means "anything

14  of value or advantage, present or prospective," A.R.S. 13-105.3 (Supp. 2012),
and it is defined broadly to encompass both pecuniary and non-pecuniary gain.

15  State v. Henry, 205 Ariz. 229, 233, ¶15, 68 P.3d 455, 459 (App. 2003).

16      a.  Count One

17      Appellant was convicted of one count of fraudulent schemes and
artifices for making false or fraudulent representations to Lima of Luxury

18  Home, Janssen of A&A Funding, and Kaplan and Ziegler of Mortgages, Ltd.,
in order to knowingly obtain the benefit of a $2.2 million mortgage from

19  Mortgages, Ltd.

20      During the trial, the State introduced sufficient evidence of the false or
fraudulent representations made by Appellant.  Cooper testified that Appellant

21  posed as Cooper when he was negotiating to buy theQuartz Mountain
Property. Although Cooper objected to Appellant buying the Quartz Mountain

22  Property when he first learned of the negotiations, he testified he signed the
closing documents after Appellant told him that everything was alright.

23

24      Brooks prepared a 2003 corporate tax return for TempleBloc.  Brooks
had no experience preparing corporate tax returns and failed to obtain annual

25  reports, profit and loss statements, or other financial records for the company;
instead, he completed the tax return based on information provided to him by

26  Appellant.  The tax return listed assets in the amount of $1,031,610 for
TempleBloc.  However, TempleBloc conducted no form of legitimate

27  business.

28

- 14 -

Lima testified that Appellant told him that he was the right-hand man for Cooper and that he would be buying the Quartz Mountain Property on Cooper's behalf.  Lima testified that he witnessed Appellant sign a price concession document as Cooper.

Appellant also informed Lima that Cooper had an escrow account of approximately $1 million, and Cooper was planning on using that money to purchase properties in Arizona.  However, when asked if he had an escrow account from Diversified Title and Escrow in the amount of $800,000, Cooper testified that he had no knowledge of the account.

After Appellant informed Lima that he was having trouble getting conventional financing, Lima referred Appellant to Janssen of A&A Funding.  Janssen identified Appellant in a photo lineup as Cooper.  Janssen testified that he packaged a loan for the Quartz Mountain Property anad that he considered TempleBloc's 2003 corporate tax return when generating the loan application.  Janssen further testified that Appellant signed documents with Cooper's signature.

Janssen also stated he brokered the loan to Mortgages, Ltd. because his company did not have an in-house funding source for a loan the size required to obtain the Quartz Mountain Property.  He testified that he provided the documentation given to him for the loan application to Mortgages, Ltd., including TempleBloc's fraudulent tax return.

Kaplan and Zeigler of Mortgages, Ltd. testified that Appellant held himself out to be Cooper during the walk through of the Quartz Mountain Property and signed loan commitment documents with Cooper's name.  They both also identified Appellant as the man they believed to be Cooper in a photo lineup.  Kaplan said that TempleBloc's tax return was material to his decision to fund the loan.

In his supplemental brief, Appellant questions who actually received the benefit of the $2.2 million loan.  He believes that Kaplan testified falsely when he said that Cooper was the borrower and not TempleBloc.  However, TempleBloc was merely a shell corporation that conducted no legitimate form of business.  Appellant personally negotiated with the parties and made the false representations necessary to secure the $2.2 million loan, not Cooper.  As a result of these fraudulent representations, Appellant obtained the benefit of a $2.2 million loan from Mortgages, Ltd.  This loan was used to finance the acquisition of the Quartz Mountain Property, in which Appellant and Veronica lived.

b. Count Three

Appellant was also convicted of one count of fraudulent schemes and artifices for making false or fraudulent representations in order to knowingly obtain the benefit of an $850,000 loan from Hancock.  At trial, the State introduced sufficient evidence of the false or fraudulent representations made by Appellant to Hancock in order to obtain the loan.

Hancock testified that he entered into negotiations to provide a loan to Appellant, who he blieved to be Cooper, using the nickname Lane Quue.  Hancock identified Appellant as Cooper or Lane Quue during a photo lineup.  Hancock also testified that he was told that the Quartz Mountain Property was

owned free and clear by Cooper, who he identified as Appellant. He stated that if he had known there were other liens against the property, he would never have agreed to lend money to Appellant, especially in light of th size of the other liens.

Appellant misrepresented to Hancock that the Quartz Mountain Property was owned free and clear when, in reality, he had fraudulently released liens in the amount of $2.2 million and $600,000 against the Quartz Mountain Property. As a result of these misrepresentations, Appellant received a benefit: Hancock extended an $850,000 line of credit to him.

### c. Count Four

Appellant was convicted of one final count of fraudulent schemes and artifices for making false or fradulent representations in order to knowingly obtain the benefit of leases on four Hummers from Kachina. At trial, the State introduced sufficient evidence of the false or fraudulent representations made by Appellant to Kachina to obtain the leases.

Appellant first contends that no evidence was presented that Appellant or TempleBloc obtained leases in Cooper's name. However, Cooper testified that Appellant negotiated the leases for the Hummers. Additionally, Heiner, a salesman for Kachina, identified Appellant in a photo lineup and testified that he worked primarily with Appellant in negotiating the leases for the four Hummers. He further testified that Appellant informed him that he was negotiating on Cooper's behalf and that Cooper wanted to lease the vehicles in TempleBloc's name.

As described above, Appellant was instrumental in creating a fraudulent tax return for TempleBloc that included $1,031,610 in assets, even though Templebloc conducted no form of legitimate business. Appellant provided templeBloc's fraudulent tax return to Kachina in order to obtain the leases. When shown TempleBloc's tax return during trial, Heiner testified that the return would have been required for a GMAC credit applicaiton in order to obtain the leases on the four vehicles. He stated that GMAC would have relied on the tax return in order to establish that the leassee had sufficient income to repay the loans and to guarantee return of the vehicles at the end of their lease.

Appellant contends that TempleBloc obtained the benefit because TempleBloc's name was on the leases. However, as previously stated, TempleBloc was merely a shell corporation that conduted no legitimate business. Appellant negotiated with the parties and made the false representations necessary to secure the four leases. As a result of Appellant's false or fraudulent representations, he obtained the benefit of leases on four Hummers from Kachina.

### ii. Theft

Appellant also contends that the State introduced insufficient evidence to convict him of count five. Under count five, Appellant was charged with theft because he obtained $475,000 from Hancock using forged lien releases in order to represent the already mortgaged Quartz Mountain Property as good collateral for an $850,000 loan. To convict a defendant of theft, the State must prove that the defendant "[o]btain[ed] services or property of another by means

of any material misrepresentation with intent to deprive the other person of such property or services." A.R.S. 13-1802.A.3 (Supp. 2012).

During Appellant's trial, the State introduced sufficient evidence to convict Appellant of this crime. Cooper testified that Appellant told him that he was going to release the loans from the Quartz Mountain Property because he wanted to refinance. Appellant used the Internet to learn how to release loans from a property and told Cooper that by doing that, the house becomes "yours outright."

Flagg-Thomas testified that Appellant asked her if she knew anyone who could notarize documents. She introduced Appellant to her friend Emudianughe. Emudianughe testified that Appellant told her his name was Daniel Moore when she met him, and she identified him in a photo lineup as Daniel Moore. She testified further that after signing one lien release as Daniel Moore, Appellant signed another lien release in the name of Dr. Greenberg, who he claimed was his brother.

Appellant contends that there was no evidence that material misrepresentations were made to Hancock related to the fraudulent lien releases. However, Hancock testified that Appellant told him that he owned the Quartz Mountain Property free an clear and that statement was material to his decision to loan money to Appellant. Hancock loaned Appellant a total of $475,000, consisting of one draw in the amount of $225,000 and a second draw of $250,000. After securing these funds, Appellant and Veronica moved to Atlanta. There is no indication that Appellant intended to repay the funds received from Hancock. Therefore, we find that sufficient evidence was presented at trial to convict Appellant of theft.

(Exh. BB, at ¶¶ 55-75.)

Petitioner does not address the Court's analysis or ruling in his habeas petition, other than to incorporate the facts in his appellate court briefs, and to assert that "[t]he state's theory at trial was that the petitioner, as an accomplice (along with 2 other accomplices), committed the crimes alleged in Counts 1, 3, 4 + 5," and that "the facts are that the benefits alleged in each count were obtained by a corporate entity (enterprise)."   In his Traverse, Petitioner asserts that the State, at the beginning of its closing argument referred to Petitioner, and his co-defendants Veronica and Willard Cooper as "accomplices." (Doc. 22-1, at 9.) This one statement taken out of context simply does not transform the State's closing arguments into a "theory" of accomplice liability. The State's "theory" as made clear upon a review of the opening and closing arguments, was that Petitioner was the principal architect of the fraudulent schemes and theft. In addition, the State emphasized, and the Court of Appeals found, that the "corporate entity," i.e., TempleBloc was a shell corporation that

1   conducted no legitimate business, and that Petitioner was the direct beneficiary of the

2   schemes and theft.

3        Petitioner does not argue that the Arizona Court of Appeals rejection of his claim was

4   "based on an unreasonable determination of the facts."   See 28 U.S.C. 2254(d)(2).

5   Furthermore, he does not address in his Traverse, the Respondents' numerous citations to the

6   record of the trial evidence supporting the Court of Appeals factual determinations.

7   Petitioner does not establish that no "rational trier of fact could have found the essential

8   elements of the crime beyond a reasonable doubt."   Jackson, 443 U.S. at 319, and thus, his

9   claim lacks merit, and should be denied and dismissed.

10  **IV.    Ground 3.**

11       Petitioner asserts that his sentence is illegal/unlawful and imposed in an unlawful

12  manner, in that the written judgment of the court varies from the orally pronounced sentence,

13  and that he was not given constitutionally required notice of the sentencing enhancements

14  sought by the state.  Other than a reference to a violation of his "due process rights under the

15  U.S. Constitution," Petitioner cites no additional federal legal authority in his habeas petition

16  in support of his sentencing claim.  A petitioner's "conclusory citation [to Amendments to

17  the United States Constitution] does not transform his state-law claims into federal ones."

18  Poland, 169 F.3d at 584.  Additionally, state law sentencing claims are not subject to federal

19  habeas corpus review.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994)

20  (declining to consider claim that petitioner was denied due process when he was sentenced

21  to consecutive sentences without any explanation because "[t]he decision whether to impose

22  sentences concurrently or consecutively is a matter of state criminal procedure and is not

23  within the purview of federal habeas corpus"); Hendricks v. Zenon, 993 F.2d 664, 674 (9th

24  Cir. 1993) (holding that "claim regarding merger of convictions for sentencing is exclusively

25  concerned with state law and therefore not cognizable in a federal habeas corpus

26  proceeding.") The provisions of state law applicable to errors in Petitioner's sentencing are

27  Ariz. R. Crim. P. 24.4 (governing mistakes in judgments); A.R.S. §§13-703 (sentencing

28  provisions applicable to "repetitive offenders" who have prior felony convictions); -708

1    (sentencing provisions applicable to offenders who commit crimes while released from

2    confinement).

3          Petitioner asserted the same sentencing errors in ground 3 of his habeas petition before

4    the Arizona Court of Appeals, which resolved them entirely on state law grounds:

5              IV. Sentencing

6              Defendant's brief raises a number of sentencing issues, many of which
       stem from the same course of events.  On June 10, 2008, just prior to the trial
7       court granting the Motion to Remand, the State filed "State's Motion to
       Amend Indictment to allege Defendant's Prior Convictions."  The motion
8       stated "[t]he State intends to use [Appellant]'s prior felony convictions at trial
       and at sentencing" and listed three alleged prior convictions: (1) a 1997 federal
9       felony conviction in the Northern District of Texas, Dallas Division for one
       count of conspiracy to possess unauthorized access devices and one count of
10      counterfeit access devices (aiding and abetting); (2) a 2000 federal felony
       conviction in the Northern District of Texas, Dallas Division for bank fraud;
11      and (3) a 2003 Arizona felony conviction for fraudulent schemes and artifices.
       The motion also indicated Appellant's violation of his term of release for the
12      second prior and violation of probation on the third prior.  Appellant takes
       issue with several elements of this motion.

13
              A.  Failure to Allege Supervised Release Status
14
              First, Appellant contends that the State failed to properly allege that he
15     was on probation, parole, or supervised release at the time of his arrest.  This
       argument is without merit.  Appellant's enhanced sentence was based on his
16     prior convictions, which moved him from the first-time offender sentencing
       scheme into the repetitive offender sentencing scheme pursuant to A.R.S. §13-
17     703.C, J (Supp. 2012).  Although the trial court mentioned the fact that
       Appellant was on probation at the time of the current offenses at Appellant's
18     sentencing, this also was not the reason the trial court cited for giving
       Appellant the presumptive sentence within the repetitive offender sentencing
19     scheme.  The trial court sentenced Appellant to a presumptive term based on
       its determination that the aggravating and mitigating factors balanced out.

20
              Additionally, the fact that Appellant was on probation at the time of his
21     arrest was addressed in two settlement conference memoranda, filed by the
       State on December 18, 2007 and February 6, 2008.  The memoranda cite
22     A.R.S. §13-604.02B [footnote omitted] and state that Appellant "must be
       sentenced to at least the presumptive term, as these offenses were committed
23     while [Appellant] was on probation."  Thus, we find Appellant had prior notice
       of the State's intent to use the fact that Appellant was on probation at the time
24     he committed the current offense during Appellant's sentencing.

25    ///

26    ///

27    ///

28    ///

**B.  Lack of Adequate Notice of Intent to Use Historical**
**Priors for Sentence Enhancement**

Appellant further contends that the State failed to give him adequate notice of its intent to use his prior convictions for sentence enhancement. Arizona Revised Statutes §13-703.N requires that notice be given of the State's intent to prove priors any time before the case is actually tried, and at least twenty days before the case is actually tried if there is a possibility of prejudice.

Here, Appellant was put on notice of the possible sentencing implication of his historical priors as early as December 18, 2007, when the State filed a Settlement Conference Memorandum detailing Appellant's three prior convictions and the effects that those convictions could have on Appellant's sentence.  Additionally, the State filed a second Settlement Conference Memorandum on February 6, 2008 that outlined the enhancement effect that his historical priors would have on his sentence.

In addition, the State filed its Motion to Amend Indictment to Allege [Appellant]'s Prior Convictions on June 10, 2008.  This motion discussed Appellant's prior convictions and stated that "[t]he State intends to use [Appellant]'s prior felony convictions at trial and at sentencing."

Appellant also contends that the State's Motion to Amend "did not amend [the] charging document to allege any statutes to authorize a sentence in the two historical prior range."  However, Appellant was put on notice of the increased presumptive sentence that he would receive as a result of his prior felony convictions in the two settlement conference memoranda filed by the State.

We therefore find that not prejudice or surprise resulted from the omission of the citation in the indictment.  Additionally, because the trial did not commence until November 3, 2008, both provisions of A.R.S. §13-03.N were satisfied, and Appellant was undoubtedly on notice of the potential punishments for his crimes.

**C.  Failure to Prove Historical Priors**

Appellant then argues that regardless of the issue of notice, the State failed to prove the prior convictions at the priors hearing.  At the hearing, the State introduced certified copies of Appellant's prior convictions, and Appellant's probation officer testified regarding the identity of Appellant. Appellant contends that the only way to prove alleged priors is to submit a certified record of the conviction containing defendant's fingerprints and then call a fingerprint analyst to testify that the fingerprints are in fact those of the defendant.  "Although the preferred method of proving prior convictions for sentence-enhancement purposes is submission of certified conviction documents bearing the defendant's fingerprints, courts may consider other kinds of evidence as well." *State v. Robles*, 213 Ariz. 268, 273, ¶ 16, 141 P.3d 748, 753 (App. 2006) (citation omitted).

In this case, the State submitted both documentary and testimonial evidence that established that Appellant's prior convictions existed and that Appellant was the party named in those prior convictions.  The probation officer testified that even though he had not been present at trial or sentencing

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

for Appellant's federal convictions, Appellant presented himself to the probation officer upon his relocation to Arizona and identified himself as Delanie Ross. In addition , the trial court took proper judicial notice of its own records in verifying Appellant's prior Arizona conviction and probation status. *See* Ariz. R. Evid. 201; *see also In re Sabino R.*, 198 Ariz. 424, 425, ¶ 4, 10 P.3d 1211, 1212 (App. 2000). This combination of evidence meets the clear and convincing burden required to prove Appellant's prior convictions for sentence enhancement purposes.

### D.  Use of Foreign Priors

Appellant further contends that his foreign priors are unusable because the State did not demonstrate that they would be felonies in Arizona. "Before using a foreign conviction for sentencing enhancement purposes under 13-604, the superior court must first conclude that the foreign conviction includes 'every element that would be required to prove an enumerated Arizona offense.'" *State v. Crawford*, 214 Ariz. 129, 131, ¶ 7, 149 P.3d 753, 755 (*quoting State v. Ault*, 157 Ariz. 516, 521, 759 P.2d 1320, 1325 (1988)).

The record reflects that the trial court found that Appellant's federal conviction for bank fraud required proof of all the necessary elements of fraudulent schemes and artifices, a class two felony in Arizona. As such, the trial court did not abuse its discretion to use the foreign prior for sentence enhancement.

### E.  Unlawful Sentence

Finally, Appellant argues that the sentence given by the trial court was unlawful. Upon review, there are two separate issues concerning the trial court's initial sentence. Appellant only argues the first, but we consider both.

#### i.    *Errors in Oral Pronouncement*

The first issue concerns clerical errors made in the oral pronouncement of Appellant's sentence. In the oral pronouncement, the trial court made several errors, such as issuing Appellant a sentence for count two, for which he was not convicted. In the written pronouncement of sentence, the sentences were attributed to the proper counts, but the dates for Appellant's prior convictions were entered incorrectly. Appellant is correct in asserting that this constitutes an error; however, his argument that the oral pronouncement controls is flawed.

"[W]hen there is a discrepancy between the oral pronouncement of sentence and the minute entry that cannot be resolved by reference to the record, a remand for clarification of sentence is appropriate." *State v. Bowles*, 173 Ariz. 214, 216, 814 P.2d 209, 211 (App. 1992). In *Bowles*, the court referenced other parts of the record that indicated that the trial court intended the defendant's sentence to be consistent with the written pronouncement. *Id.* As such, the court determined that because the trial court's intent was manifest, remand was unnecessary. *Id.*

Here, the trial court held an additional hearing on February 12, 2010, in which it clarified the record and removed any doubt about its intent. During this hearing, the trial court corrected both the sentences issued for each count and the dates of the prior convictions used for sentence enhancement. As the

discrepancy between the oral pronouncement and written pronouncement can be resolved by referencing the record, there is no need for remand on this issue.

(Exh. BB, at ¶¶99-114.)

In Petitioner's Traverse, he cites several federal cases he claims stand for the proposition that an orally pronounced sentence is the sentence that constitutes the court's judgment, and since it was deficient as described above, his sentence was unlawful and must be "stricken." (Doc. 22-1, at 13-22.) He does not address to Respondents' argument that Petitioner's claim that he received insufficient notice of sentencing enhancements does not raise a federal claim, and lacks merit.

The cases cited by Petitioner do not establish that an oral pronouncement of sentence always controls, such that any later amendment or clarification necessarily constitutes constitutional error: the Ninth Circuit, in Boyd v. Archer, 42 F.3d 43, 44-46 (9th Cir. 1930) held that the intent of the court is taken into consideration in resolving sentencing ambiguities: in Biddle v. Shirley, 16 F.2d 566, 567 (8th Cir. 1926), the Eighth Circuit held that the trial court retained jurisdiction to take a defendant back into custody to impose a sentence on a count of conviction that had been announced at sentencing, but that did not appear in the order of commitment: in Miller v. Aderhold, 288 U.S. 206, 211 (1933), the Supreme Court held that the trial court retained jurisdiction, when a defendant's sentence had been "suspended," to impose a later sentence of incarceration: and, in Hill v. United States ex rel. Wampler, 298 U.S. 460, 464 (1936), the Supreme Court, although holding that the insertion by a courtroom clerk of a substantive sentencing term not ordered by the court rendered that term void, a variance between an oral and written sentence or commitment may be corrected by the trial court in a direct proceeding.

Even if Petitioner's ground 3 of his habeas petition can be construed to raise a federal claim, it nonetheless lacks merit. Petitioner does not establish that the Arizona Court of Appeal's decision was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court

1   proceeding.  28 U.S.C. § 2254(d).  That Court's reasoning that the trial court's expression

2   of intent as to Petitioner's sentence resolved the ambiguity between the orally pronounced

3   sentence and the minute entry, particularly in light of the fact that the trial court held a

4   subsequent hearing to correct the errors, was not contrary to, or involved an unreasonable

5   application of Supreme Court decisions or other federal law cited by Petitioner.  The

6   discrepancy between the oral and written pronouncement of sentence was "resolved by

7   referencing the record," which included a detailed hearing that clarified the trial court's intent

8   and also conformed the orally pronounced sentence to the jury verdicts.  (Ex. BB, at ¶ 114.)

9       Petitioner also does not demonstrate that the Arizona Court of Appeals unreasonably

10  determined the facts in light of the state court record.  Petitioner asserts that the court of

11  appeals "reinstated [his] 7/1/2009 sentence" and argues that this was a "blanket

12  reinstatement" of his original, flawed sentence.  (Doc. 1, at 8.)  The Arizona court of appeals

13  however, in its memorandum decision, made clear in the context of the entire opinion that

14  it was not reinstating the entirety of the trial court's 7/17/09 sentencing minute entry, but

15  rather it was simply reinstating the order awarding Petitioner's 1,626 days of presentence

16  incarceration credit.  (Ex. BB, at ¶¶ 119-120.)

17      Petitioner was convicted by a jury at trial of counts 1, 3, and 4, fraudulent schemes

18  and artifices, and count 5, theft.  That much is abundantly clear from the record and

19  Petitioner does not dispute this fact.  Petitioner, however, asserts that constitutional error

20  occurred due to the trial court's mis-numbering the counts of conviction during its

21  pronouncement of sentence.  The trial court took steps after the discovery of the error to

22  conform the oral pronouncement to the written judgment.  As set forth above, ground 3 of

23  Petitioner's habeas petition does not raise a federal claim, and in any event lacks merit, and

24  should be denied and dismissed.

25  \\\

26  \\\

27  \\\

28  \\\

**CONCLUSION**

For the foregoing reasons, this Court finds that Petitioner's grounds 1, 2 and 3 of his habeas petition do not raise a federal claim and, in any event, lack merit.  Wherefore, this Court will  recommend that Petitioner's Petition for Writ of Habeas Corpus be denied and dismissed with prejudice.

**IT IS THEREFORE RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** and **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED** because dismissal of the habeas petition is justified by a plain procedural bar and jurists of reason would not find the procedural ruling debatable.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment.  The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  See 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure.  Thereafter, the parties have fourteen days within which to file a response to the objections.  Pursuant to Rule 7.2, Local Rules of Civil Procedure for the United States District Court for the District of Arizona, **objections to the Report and Recommendation may not exceed seventeen (17) pages in length**.

Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review.  See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.  See Rule 72, Federal Rules of Civil Procedure.

1    **IT IS FURTHER ORDERED** that Petitioner's Motion for Ruling, and Motion for

2    Status (Docs. 28, 29), be denied as moot.

3    DATED this 4th day of June, 2015.

4

5    _Michelle H. Burns_

6    Michelle H. Burns
     United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28